BEEBE *v.* OLENTINE.

## Opinion delivered January 30, 1911.

1. PARTNERSHIP—TEST.—In order to constitute a partnership, it is necessary that there shall be something more than a joint ownership of property; and while an agreement to share profits is not a test of partnership, it is an essential element thereof. (Page 395.)

2. SAME—CONSTRUCTION OF CONTRACT.—Under a contract whereby two persons were to buy certain lands for the purpose of resale, sharing equally in the expenses and profits, a partnership was formed. (Page 395.)

3. FRAUDS, STATUTE OF—JOINT VENTURE IN REALTY.—A verbal agreement between two persons whereby they agree to buy certain lands jointly and to divide the profits from a resale thereof is not within the statute of frauds. (Page 396.)

Appeal from Pike Chancery Court; *James D. Shaver,* Chancellor; affirmed.

### STATEMENT BY THE COURT.

About the 1st of January, 1905, Charles Olentine and Elmer E. Shock conceived the plan of buying up certain timber lands in Pike County, Arkansas, from various persons and selling them for a profit. According to the testimony of Shock, each was to pay half of the purchase price, and each to have half of the final profits. In furtherance of their plan, they entered into the following written agreement with Jeff and Wallace Hughes on January 31, 1905:

"This agreement made this day by which Jeff Hughes and Wallace Hughes, of Rock Creek, Ark., are to deliver to Charles Olentine and Elmer E. Shock, their administrators or assigns, perfect titles to the following tracts of land south of Rock Creek postoffice, Ark.: W. S. Bullard, 520 acres; J. P. Farmer, 160 acres; A. S. Herring, 200 acres; W. D. Fuller, 160 acres; G. O. Doster, 160 acres; A. Doster, 320 acres; Geo. Fuller, 80 acres; Geo. Spears, 160 acres; Pat Baker, 120 acres; Frank Baker, 160 acres; Bill Baker, 120 acres; John Thornton, 160 acres. The price to be $6 per acre. The receipt of $2,000 is hereby acknowledged, the balance to be paid May 1, 1905, or as soon thereafter as perfect title can be made. In case if for some unforeseen and unavoidable event it should be impossible to perfect title to a particular tract in the above, that tract shall

be deducted from the total amount. It is understood and is made a part of this contract that the timber on this land is to remain in its present condition unless changed by Providence."

On the day this contract was executed Olentine gave a check for $1,000, payable to Wallace G. Hughes, and it was paid. On the 7th day of February, 1905, Elmer E. Shock assigned his interest in the contract with the Hughes brothers to L. V. Beebe, in consideration that Beebe should advance the money to purchase the lands, and divide equally the profits of a resale with him. On the 10th day of April, 1905, Jeff and Wallace made a contract with one Fuller to purchase 160 acres of land from him, and the deed was made to Charles Olentine and E. E. Shock jointly.

The remainder of the land purchased by Jeff and Wallace Hughes was conveyed to L. V. Beebe, and comprised about 1,039 acres. Beebe paid therefor $7,214 by check. The first check is dated February 7, 1905, for $1,000, payable to E. E. Shock. The second check is dated April 18, 1905, for $480, payable to Wallace Hughes. The third check is dated June 2, 1905, for $2,000, payable to Wallace Hughes. The fourth check is dated June 12, 1905, for $2,380, payable to Wallace Hughes. The fifth check is dated July 26, 1905, for $1,354, payable to Wallace Hughes.

In 1908 the lands were sold to the Caddo River Lumber Company for a profit. The above facts are undisputed.

This suit was instituted in the chancery court by Charles Olentine against Elmer E. Shock and L. V. Beebe, in which he claimed to be equitable owner of a half interest in the lands conveyed to Beebe. The prayer of his complaint was that his interest in the lands be declared and fixed, and that he have judgment for one-half the amount agreed to be paid by the Caddo River Lumber Company for the lands, less the amount due Beebe for advances of purchase money made by him.

The Caddo River Lumber Company paid the balance of the purchase money due by it into the registry of the court. Subsequently Olentine filed an amendment to his complaint in which he alleges that he is entitled to one-half of the profits arising from the sale of the lands, and that Beebe and Shock

are endeavoring to defraud him out of his share thereof. He prays judgment for his share of the profits.

The defendants, Shock and Beebe, filed a joint answer, in which they state that Olentine abandoned his contract, and that Beebe subsequently purchased the lands for his own use and benefit, with an agreement on his part to divide equally the profits of the sale thereof with Shock. They also interposed the plea of the statute of frauds.

Elmer E. Shock testified that, after making the transfer of his interest to Beebe, he acted for Beebe. He said that he had numerous conversations with Olentine about the purchase money for the lands. We quote the following from his testimony: "Q. What were the circumstances of your having the titles made to Mr. Beebe and what was your agreement with him at the time? A. I sold Mr. Beebe my interest in the contract; Mr. Olentine could not pay his part of the money, and the rest of the titles were taken in Mr. Beebe's name, he paying for them. Q. Under what sort of agreement? A. What do you mean? Q. What was the agreement with Beebe? A. Well, Mr. Beebe—Mr. Olentine could not get up his money and Mr. Beebe suggested that he take the title. Mr. Olentine said he was expecting some money from the East, and he failed to get it on account of a bank up there failing, he said. Mr. Beebe said he would take up the titles himself, and when Mr. Olentine got his money he could follow and take up the lands— other lands—as it commenced with; I believe that was the understanding with Mr. Beebe. That was the purport of the conversation between Mr. Beebe and myself."

Charles Olentine testified that he first suggested the arrangement to purchase these lands to Mr. Shock; that he told Shock that he could raise $1,000, but it would be later before he could have any more money; that he had some money coming to him in Ohio, but would not get it for a few months; that Shock told him not to worry about the money, that he had a party who would furnish the money; that at different times Shock told him that he could get the money from various parties, but that about the last of May he told him that he had made arrangements with L. V. Beebe to furnish the money; that, instead of taking a mortgage on the lands, Beebe pre-

ferred to have the title to the land made to him to secure him, and when it was satisfied he would reconvey to us; that he told Shock that this was perfectly satisfactory, and, relying on these statements and representations of Shock, he joined with him in directing that the title to the remaining lands should be taken in the name of Beebe; that Shock told him he should pay 8 per cent. interest; that Shock did not inform him that Beebe was advancing his (Shock's) part of the purchase money of the land, too; that he got his money from the East in the fall, and that in March, 1906, he went to Shock to pay his part of the purchase money, and stop the interest; that Shock then informed him that he had made a contract with Beebe by which Beebe was to share half of the profits, and that he could not take the money; that he replied that he never understood it that way; that he could have done better than that in the East.

Wallace Hughes testified that Charles Olentine paid him $1,000 on the timber contract when it was executed; that subsequently he had a talk with Shock with reference to an agreement between him and Beebe about the latter furnishing the balance of the money on the timber contract; that Shock said that Beebe had agreed to furnish him and Olentine with money enough to finish paying for the timber, and that Beebe wanted the deeds made to him as security; that he never had any conversation with Beebe about furnishing the money; that he heard Shock tell Olentine that he had made arrangements with Beebe to furnish them money to pay for the timber, and that Beebe wanted the deeds made to him to secure him for the money loaned; that when the contract was first entered into he heard Olentine tell Shock that he did not have money enough to carry it out at that time, but would receive sufficient money to do so later; that Shock replied that he had plenty of money, and would furnish what was necessary until Olentine could get his money from Ohio.

Wallace Hughes's testimony was corroborated by that of E. C. Hughes.

L. V. Beebe testified that he purchased the lands for himself, and that at the time he did so he understood that Olentine had abandoned and given up his contract and dropped out of the deal.

The chancellor entered a decree quieting the title of the Caddo River Lumber Company in the lands, and giving to the plaintiff, Olentine, one-half of the net profits arising from the sale thereof; and the other half to Beebe. The defendants, Shock and Beebe, have duly prosecuted an appeal to this court, and the plaintiff, Olentine, has taken a cross appeal.

*J. C. Pinnix* and *T. D. Crawford,* for appellants.

1. The contract sued on falls within the meaning and purpose of the statute of frauds. Kirby's Dig., § 3654; 20 Cyc. 156; 50 Ark. 76; 55 Ark. 414; 37 Ark. 149; 42 Ark. 393; 1 Perry, Trusts, § 135; Story, Eq. Jur., § 1201a; 40 Mo. 187; 45 N. Y. 589; 40 Cal. 637; 1 Eden 515; 68 Atl. 231; 147 Mass. 328; 7 L. R. A. (N. S.) 945; 134 Mass. 109; 145 Ill. 586; 81 Wis. 104; 88 Ga. 819.

2. Before a deed absolute on its face will be adjudged to be a mortgage, the evidence must be clear and convincing, such as courts of equity require to reform a deed; and mere verbal declarations of the parties are not in general sufficient to authorize a court to declare that a deed which is absolute on its face is a mortgage. 24 Wis. 654; 27 Cyc. 1028; *Id.* 1025-7; 97 U. S. 626; 132 Ill. 243; 158 Ill. 209; 78 Ark. 527; 48 Ark. 169 and authorities cited; 142 Ill. 482; 11 Ark. 82; 75 Ark. 551; 31 Ark. 163; 19 Ark. 278; 188 Pa. St. 279; 176 Pa. St. 331; 3 Rich. Eq. 153.

3. The testimony of appellee as to what Shock told him was incompetent. To bind Beebe by his declarations, Shock must have been authorized to represent Beebe at the time the declarations were made, and they must have been so connected with the business of Beebe which Shock was authorized to transact as to constitute a part of the *res gestae.* There is no proof that he was acting as Beebe's agent at the time the declarations were made. 77 Ala. 184. See also 40 Ark. 62; 29 Ark. 630; 42 Ark. 503.

*McRae & Tompkins* and *D. L. McRae,* for appellee.

The contract does not come within the statute of frauds, because:

1. Olentine is not suing for an interest in lands, but for a division of the profits. 71 Ark. 323; 77 Am. Dec. 679.

2.  His interest did not rest in parol, but upon the written contract of January 31, 1905.

3.  Beebe by his purchase of Shock's interest became either a partner or co-tenant with Olentine and could acquire no interest adverse to him.  Equity will not permit one co-tenant to acquire title against the other, but will hold him as trustee.  23 Cyc. 492; 20 Ark. 381; 32 Am. Dec. 70; 9 Fed. Case No. 4847; 64 Am. Dec. 696; 17 Am. & Eng. Enc. of L. 674; *Id.* 675; 5 Johns. Ch. 388, 407; 49 Ark. 242; 40 Ark. 42; 56 Ark. 187; 4 Ill. 78; 84 Am. Dec. 552.  If the parties were partners, the rule is the same.  17 Ves. 298; 53 Ark. 152.

Olentine will not be held to have forfeited his rights until he has notice of the exclusive claim made by Beebe.  Regardless of the contract, he had a right to presume that Beebe's payment of the purchase money was made in support of the common title. 17 Am. & Eng. Enc. of L. 679.  The burden of proof is on the purchasing tenant to show that the co-tenant had notice of the purchase and of the exclusive claim set up by him.  17 Am. & Eng. Enc. of L. 680.

HART, J., (after stating the facts).  Did the original agreement between Shock and Olentine create a partnership for the purchase and sale of lands?

In the case of *Lacotts* v. *Pike,* 91 Ark. 26, the court held:

"1.  In order to constitute a partnership, it is necessary that there shall be something more than a joint ownership of property.

"2.  While an agreement to share in profits is not a test of partnership, it is an essential element in one."

And in the case of *Buford* v. Lewis, 87 Ark. 412, the court said: "To determine whether a given agreement amounts to a partnership between the parties themselves is always a question of intention."

About one month before the contract of the date of January 31, 1905, between Jeff and Wallace Hughes and Olentine and Shock was entered into, Olentine had proposed to Shock that they purchase the lands designated in that contract.  The testimony shows that the lands were valuable chiefly for the timber that was on them, and that they were to be purchased for the profits to be derived from a sale of the timber and of the lands

themselves.  The lands, the purchase and sale of which was contemplated, comprised in the aggregate some 2,000 acres, and they were owned by various persons.  Shock himself testifies that each was to pay one-half of the money, and each to share one-half of the final profits.  Thus we see they entered into a contract to purchase jointly, for the purpose of speculation, numerous tracts of land, and each was to pay an equal amount of the purchase price and to share equally in the final profits arising from future sales; and in furtherance of this purpose they made the contract with Wallace and Jeff Hughes to purchase lands for them.  It was evidently their intention to form a partnership for the purchase and sale of timber lands in Pike County, and we so hold.  Each owed to the other the utmost good faith and openness of dealing with regard to the carrying out of their joint venture.  Neither had a right to secure any secret advantage over the other out of the transaction, and such acts would be a fraud upon his associate, which equity will defeat.

It is apparent that Shock did not act in good faith towards Olentine.  The testimony of both Olentine and Hughes shows that at the very inception of their enterprise Shock deceived Olentine.  Shock promised him that he would furnish him all the money he needed in excess of one thousand dollars, which Olentine at the time paid, yet in one week thereafter he entered into an agreement with Beebe to take the title in the lands and divide with him the profits arising from a resale of the lands, and this agreement was kept secret from Olentine.  Later on in May, in furtherance of his fraudulent design, he told Olentine that Beebe had agreed to advance the money for the purchase of lands and charge 8 per cent. interest thereon; but that Beebe, instead of taking a mortgage on the lands to secure himself, desired to take the title to them in his own name as security. Olentine, knowing that he would receive his money from Ohio in time to pay out his interest, readily agreed to this, and joined with Shock in directing Hughes to have the deeds to the lands made to Beebe.  Shock had told Olentine that he represented Beebe in making him the loan; and, when Olentine received his own money from Ohio, he went to Shock to pay the money advanced by Beebe and the accrued interest, Shock for the first time told him that he had no interest.  It is perfectly apparent

that Shock from the beginning formed the design to defraud Olentine. Shock told him that he represented Beebe, and that the latter was advancing Olentine the money to pay for his interest in the lands, and was merely taking the title in himself as security. Equity will not permit Shock to hold the fruits of his fraud. The case as between Shock and Olentine then stands as if Shock had advanced the money and taken the title in his own name for the benefit of both; and Olentine is entitled to one-half of the net profits. The amendment to his complaint asks for an equal share of the profits, and, the relation between Olentine and Shock being that of partners, the statute of frauds does not enter into the case. *McClintock* v. *Thweatt*, 71 Ark. 323. See, also, *Chester* v. *Dickerson* 54 N. Y. 1; *Richards* v. *Grinnell*, 63 Iowa 44, 50 Am. Rep. 727; *Hulett* v. *Fairbanks*, 40 Ohio St. 233; *Newell* v. *Cochran*, 41 Minn. 374; *Davenport* v. *Buchanan*, (S. D.) 61 N. W. 47; *Heard* v. *Wilder* (Iowa), 61 N. W. 1075.

Beebe admits that Shock acted as his agent in the purchase and sale of the lands, but states that he told him that Olentine had abandoned the contract, and he says that, acting upon this representation, he purchased the lands for his own use and benefit; but he filed a joint answer with Shock in which they admitted that the net profits were to be divided equally between them. Having admitted that he is only entitled to one-half of the profits, he cannot complain that the other half was awarded to Olentine. It will be noted that the decree of the chancellor divided the net profits between Beebe and Olentine.

We find the issues against the appellee on the cross-appeal, and think that the decree of the chancellor dividing the net profits between Beebe and Olentine was right.