HARRISON *v.* WALKER.

Opinion delivered June 26, 1916.

1.    BILLS AND NOTES—POSSESSION BY JOINT MAKER.—Possession of a promissory note by several of a number of joint makers, is *prima facie* evidence of payment thereof, by those in possession.

2.    PARTNERSHIP—PURCHASE OF STALLION—JOINT OWNERSHIP.—An agreement for the joint purchase and ownership of a stallion, for which the joint notes of the purchasers were given, will not raise a presumption that a partnership was formed between the parties. A mere community interest by ownership, does not show a partnership.

3.    FRAUD—EXECUTION OF NOTE—PURCHASE OF STALLION.—Defendants executed a note jointly with pliantiffs for the purchase of a stallion. *Held,* under the evidence, that defendant's signatures were not procured by fraud.

4.    FRAUD—SIGNATURE TO INSTRUMENT—KNOWLEDGE OF CONTENTS.— The signatures to a contract whereby certain parties agreed jointly to purchase a stallion, held not to have been fraudulently obtained.

5.    BILLS AND NOTES—JOINT MAKERS—PURCHASE OF STALLION—LIABILITY.—A note executed by plaintiffs and defendants jointly, for the purchase of a stallion, was paid by plaintiffs, who sued defendants for their pro rata share of the same. *Held,* a recovery could be had, and that when the parties had not acted upon the provisions of the contract, with respect to a breach of guaranty by the seller, that the defendants could not plead the same as a defense.

Appeal from White Circuit Court; *J. M. Jackson,* Judge; affirmed.

Separate suits were instituted by the appellees against appellants to recover on two promissory notes, each for the sum of $800. The form of the notes was as follows:

"$800.                                    Paola, Kan., Nov. 18, 1912.

"Eighteen months after date, for value received, we promise to pay J. M. Nolan, or order, the sum of eight hundred dollars, with interest from date at the rate of 6 per cent. per annum, payable annually at the Citizens State Bank, of Paola, Kansas. If not paid at maturity, to draw 10 per cent. from date."

The other note was of the same date and for the same amount, but was due thirty months from date.

The appellees, in their complaint, after setting out the notes sued on, alleged that the notes were executed jointly by the appellees and the appellants, and that when the notes became due appellants refused to pay any part of the same, and that appellees were forced to pay and did pay the notes in full, and alleged that appellants were jointly indebted to them for their *pro rata* amount.

The appellants answered, denying the material allegations of the complaint, and set up fraud in the procurement of their signatures to the notes by the agent of the vendor, and also by fraudulent statements of the president of the Center Hill Horse Company; and, further, that the notes were void because of the failure on the part of the vendor to comply with the written guaranty, and because of the failure on the part of the appellees to protect the interests of the Center Hill Horse Company; and alleged that the payments by the appellees were voluntary and not binding on appellants. They further set up that under the contract and agreement under which the horse was purchased, the appellees and appellants were constituted a partnership, and asked that the cause be transferred to equity for the purpose of an accounting and winding up of the affairs of the partner-

ship and readjustment of the equities between the parties.

The record does not show that the motion to transfer was ever ruled on by the court. The causes were, by consent, consolidated and tried together.

The testimony on behalf of the appellees tended to prove that appellees and appellants bought together from one J. M. Nolan, of Paola, Kansas, a certain stallion for which they executed their joint notes in the form set out above, and these notes were read to the jury. The appellees paid the notes, and upon the receipt of payment the payee, Nolan, executed a receipt which described the notes in suit, and recited that the balance on same had been paid by the appellees as joint makers, and that the appellants had refused and failed to pay any part of the same. It was shown that there was a balance of $200 due on each note.

The testimony shows that all the parties organized what they designated as the "Center Hill Horse Company." The agent who represented the owner of the horse circulated an agreement for a joint stock company, which appellees and appellants all signed. There was some question among them the first night, after the agreement was signed, as to whether they were bound by the contract to subscribe for stock in the horse company. Two of the appellees went to the town of Searcy to ascertain if they were liable, and all parties met on the next night and signed the notes. The agent of the owner of the horse stated, on the night the note was signed, that if the appellants did not sign the notes he would sue them on their contract.

The horse was bought on a written guaranty, which was executed the same night the notes were signed, in which the vendor, among other things, agreed that "if said horse should not prove himself an average foal getter, after a fair trial on breeding mares, the purchaser shall return him to the Joseph M. Nolan Horse Company of Paola, Kansas, and receive from them another horse

of equal value. This exchange must be made before April 1, 1915.''

The contract of guaranty further specified that the sellers of the horse were not to be bound by the conditions of the guaranty unless the purchasers submitted to them a monthly report in writing showing the number of mares served, the number of mares tried and reserved each month from date of purchase.

It was shown that the appellants and appellee organized the Center Hill Horse Company, with a president and secretary. Appellees were notified of the meeting of the company by the secretary. There were forty mares served during the year 1913, and sixteen colts resulted. The number of colts was not reported to the Nolan Horse Company, but was reported to the secretary of their own company. Neither the secretary nor any member of the Center Hill Horse Company ever offered to exchange the stallion.

It was shown that before the notes in suit became due the appellants and the appellees signed another note to the Peoples Bank in order to get money to take up the notes in suit, but the bank refused to loan them the money. That was sometime in the winter after the purchase of the horse in November and before the notes in suit were due. The parties had a proposition from the vendor and payee to shave the notes, giving them a six per cent. reduction, and they got together and signed up another note for that purpose.

J. C. Harrison, for appellants, testified substantially as follows: He signed the notes in controversy. There were eight of them present at the Center Hill school house when the notes were signed, and also the agent of the Nolan Horse Company, the payee. Witness had signed a book that opened endways, and there was no writing at all on the page he signed. He did not know he was signing a contract. The agent asked witness if witness favored good stock, and upon witness answering that he did, the agent said he wanted witness' name. Witness told him he was not able to buy a horse, and

the agent said, "You favor good stock?" and witness told him "Yes." The agent took out his memorandum book and wanted witness' name, and witness asked him if there was anything binding about it and agent replied that there was not. Witness did not know that there was any contract until later. He found out when they told him to be out Monday night. Witness signed the note because he thought he was forced to. Welch and Walker, the president and secretary of the Center Hill Horse Company, saw a lawyer who said that they were all bound by a book they had signed to sign the notes. When witness signed the note he told the agent that he would not pay it. The witness never had any report from any of the parties as to what per cent. of the mares was foaled. He had nothing to do with letting out the horse. The other members of the Horse Company, as well as witness, were all members of that community. Witness could read and write. Witness signed the book on the top edge. He had the book in his hands when he signed it; did not see any writing or printing on it. He exhibited the way the book was turned down when he signed it. He further stated that no one kept him from looking at it and nothing prevented him from reading or seeing it. He signed the book on Saturday and on the following Tuesday he signed the note. Witness signed the note to the People's Bank in the winter, along with the other members of the Horse Company, to get the money to take up the first notes. He stated that the appellee represented to him that they would contest the payment of the note if witness would pay his part of the costs if they lost, and witness told them he would not do so. Witness had made up his mind that he would not pay the note unless he had to. He was notified several times of the meetings of the Horse Company and attended once. He signed the receipt for the horse, but did not read it. He did not read it for the reason that he did not intend to pay his part. He signed the book organizing the Horse Company.

Witness identified the writing which was signed by all the parties, which recited that all agreed to purchase the stallion in order to improve their stock, and that each share was of the value of $200. The capital stock and price of the horse was $1,600. The agreement further recited that the parties agreed with Nolan, the vendor, and with each other, that they would pay in cash the sum set opposite their names respectively when the horse was delivered to any of the subscribers; or, at their option, execute a note payable to Nolan, or bearer, secured to his satisfaction, payable one-half in eighteen months and one-half in thirty months, with interest at 6 per cent. This instrument was signed by the appellants and appellees and opposite each name was the figure "1" under the word "shares." The instrument was dated November 15, 1912, and recited that the sale was closed November 18, 1912. The same parties, on the same day, signed a receipt which specified, among other things, that the parties had received the horse in good condition and he was doing his work properly in stud, and they advertised to the public that the notes that they had given in payment for the same were the legal property of the payee to negotiate and transfer as it might elect and that the horse was value received for the notes.

R. L. Collins testified that he was one of the defendants. He signed the notes in suit. Saw the agent of the vendor company before he signed the notes. He wanted witness to sign some kind of a concern to get up a horse company; asked witness if he didn't want stock in the horse company and witness signed his name on the back of the book as favoring good stock. The book was turned back when presented to witness. He did not read the printing on the contract. Witness signed the notes because he had to and did not know any better. Witness stated that the agent took the little book out of his pocket and doubled it back with the backs together. He thought it was the agent's intention to hold some kind of a meeting and select the men who endorsed good stock. He did not know that there was any contract until that

meeting at the school house the next Monday night. At that time the little book was drawn on them, and they finally signed the notes. Witness signed the notes because they said he had it to do. Mr. Doty, the agent, said that every one that did not sign the notes would be sued the next morning. Witness had never had a lawsuit and did not want one. Witness never had any information as to what the stallion was doing, and none of the parties ever gave witness any notice of any kind concerning him. He never read the guaranty because he never saw it. Witness did not put the figure "1" on the contract after his name under the word "shares." Witness never intended to pay the notes because of the way they got him into it. However, he signed a note to the Peoples Bank about a month after the first notes were given. Witness received his stock in the company, which was delivered the same night the notes were signed. He exhibited this certificate, which recited that "R. L. Collins is the owner of one share of two hundred dollars in the Percheron Stallion, named Jupiter, No. 37892, transferable only on the books of the company in person or by attorney, on surrender of this certificate. (Signed) W. D. Welch, President. J. M. Walker, Secretary."

There was other testimony corroborating the testimony of these witnesses, to the effect that before the makers of the notes signed the same they agreed to seek legal advice as to whether they were bound by the contract in the book they had signed, that Walker and Welch went to make an investigation and came back the next night when the notes were signed, and reported that they had consulted a lawyer, Mr. Brundidge, who said that they were as much obligated as if the parties had signed the notes.

The appellants offered the contract book in evidence for the purpose of showing that it contained contracts duly signed by other people and not filled in. The court, over the objection of appellants, excluded this evidence, to which appellants duly excepted.

The court directed the jury to render a verdict in favor of the appellees in the sum of $406. Judgment was rendered for that sum, and this appeal has been duly prosecuted. Other facts stated in the opinion.

*John E. Miller* and *Rachels & Yarnell,* for appellants.

1. The verdict and judgment are not supported by the evidence. Plaintiffs only paid their share and no cause of action is shown.

2. No cause of action is stated and none proven. The notes were firm debts. Plaintiffs were a partnership with defendants. One partner cannot recover for contribution for advances or loans, nor for money paid on debts settled by him for the firm out of his private estate, apart from a general accounting and settlement. 58 Ark. 587; 72 *Id.* 470; 56 S. W. 810; 7 Ky. Law Rep. 527; 22 *Id.* 186; 30 Mich. 304; 55 Mo. 524; 101 N. W. 237; 54 S. W. 922; Cent. Dig. Partnership, Vol. 38, § § 155-157, 171. The partnership must be wound up and the accounts finally settled. 30 Cyc. 461-464, 681, 682, 692; 6 R. C. L. 1053, 1038; 30 Cyc. 453, 454, 700, 690-693.

3. The court erred in peremptorily instructing the jury to return a verdict for the plaintiffs. Where there is an instructed verdict, as here, it is the duty of this court to view the testimony most favorably to appellant and to give it its strongest probative force in deciding whether or not the court erred. Like all fraudulent transactions, a conspiracy to defraud may be inferred from the facts and circumstances shown. Smith, Law of Fraud., § 122. Here was a well-laid scheme of fraud.

*Brundidge & Neelly,* for appellees.

1. The verdict is supported by the evidence. Plaintiffs paid the notes in full as they fell due and defendants refused to pay their part.

2. There is no evidence of a partnership. It takes something more than joint ownership to create a partnership. 91 Ark. 28; 93 *Id.* 526; 97 *Id.* 390.

3.   Plaintiffs, under the law of contribution, had the right to bring this suit.  73 Ark. 178; 49 *Id.* 105; 34 *Id.* 569; *Ib.* 580; 6 R. C. L. 1036, 1047.

4.   Plaintiffs were *bona fide* holders and there was no fraud.

WOOD, J., (after stating the facts).   (1)   Appellants contend, first, that the credits endorsed on one of the notes showed that there had been paid the sum of $500, and that there was still due the sum of $300, and that the credits endorsed on the other note showed that the sum of $609 had been paid on it, and the fact that neither of the notes had been marked paid showed that the notes had not been paid, or if any amount had been paid it was no greater sum than appellees were liable for.

But the testimony of the appellees was to the effect that they had paid the notes in full.   The receipt of November 23, 1915, although executed after the suit was brought, was introduced by the appellees without objection on the part of appellants and it showed that appellee had paid the sum of $354, principal, and interest on one of the notes.   The appellees had possession of the notes, which was of itself *prima facie* evidence that same had been paid by them, and the fact that the endorsement of one of the credits was in the name of Walker, Watson and Hart and another in the name of J. W. Duncan does not tend to controvert the positive testimony on the part of the appellees that they paid the notes in full.

(2)   The appellants contend that the transactions which gave rise to the execution of these notes, as evidenced by the notes and the contract for the purchase of the horse, constituted the appellants and the appellees partners.   But this contention is not sound.   The instrument which was signed by the appellants and the appellees, by which they agreed to purchase the horse and form a joint stock company, each agreeing to take a share of $200, to be paid to the vendor of the horse, which represented their *pro rata* part of the purchase money, did not constitute appellants and appellees part-

ners. This instrument and the testimony showing the circumstances under which it was executed did not tend to prove a partnership between appellants and appellees. The most that this testimony tended to prove was an agreement between the parties for a joint purchase of the horse for which the notes were executed. A mere community of interest by joint ownership falls far short of being a partnership.

As was said in *LaCotts* v. *Pike*, 91 Ark. 28, ''In order to constitute a partnership it is necessary that there shall be something more than the joint ownership of property. A mere community interest by ownership is not sufficient. This creates a tenancy in common but not a partnership. * * * Between the parties themselves it is essential that they shall share in the profits before it can be said that an agreement of partnership has been entered into and exists.'' Citing authorities.

The testimony on the part of the appellees shows an agreement for the joint purchase and ownership of a horse and the notes evidence a joint liability, but a partnership could not be presumed from this testimony, and the appellants have wholly failed to adduce any evidence that tended to prove the essentials of a partnership. See *Roach* v. *Rector*, 93 Ark. 526; *Beebe* v. *Olentine*, 97 Ark. 390, where the subject is discussed.

(3) There was no testimony to warrant a finding that the appellees had perpetrated any fraud upon the appellants in the execution of the notes. The fact that appellees, or some of them, stated to the appellants that they had sought the advice of counsel as to whether or not the parties who had signed the contract would be liable the same as if they had executed a note and that the attorney had advised them that they would be, would not be sufficient to justify the jury in finding that this constituted a fraud upon appellants, even if they were induced by such representations to sign the notes. There was nothing in the record to show that such representations were untrue, even if appellants relied upon them and had the right to rely upon them.

(4) The evidence was not sufficient to warrant the court in submitting to the jury the question as to whether or not any fraud had been perpetrated upon the appellants, either in the signing of the contract by which they agreed to contribute so much for the purchase of the horse, designated as shares, or in the execution of the notes in suit. Appellants could not be heard to say, under their own evidence, that a fraud was perpetrated upon them, such as would avoid their contract, because of the fact that the agent of the vendor had presented to them a book representing that he was getting the names of those who were in favor of improving the stock of the community.

Appellants could read and write and the agent placed the book in their hands. There was nothing in the representations themselves that was fraudulent, and if appellants signed an instrument not knowing what it contained, the testimony shows that it was the result of their own carelessness.

(5) Even though the horse purchased may have failed to meet the requirements of the written guaranty, no advantage could be taken of this fact by the appellees or the appellants, for the guaranty expressly provided that the seller "of said horse shall not be bound by the conditions of this guaranty unless the purchaser submit them a monthly report in writing showing the condition of the horse, the number of mares served," etc. The undisputed evidence shows that this was not done. Therefore, appellants cannot avail themselves of a breach of a warranty on the part of the vendor and payee of the notes as a defense to the present suit. Furthermore, the contract provides that the remedy for the purchasers of the horse in case he proved to be unsound and unsatisfactory was a return of the horse by them on or before the first of April, 1915, and that the seller should give them in exchange another horse of equal value. This remedy, under the contract, was exclusive. *Crouch & Son* v. *Lake,* 108 Ark. 322; *Highsmith*

*Bros.* v. *Hammonds,* 99 Ark. 400; *Walters* v. *Akers,* 101 S. W. (Ky.) 1179.

As there was no defense to the notes, the appellants were jointly liable with the appellees, and as appellees had paid the notes appellants were liable to them for their *pro rata* share.

The judgment is therefore affirmed.