EDLIN *v*. MOSER.

Opinion delivered April 16, 1928.

.1. PARTNERSHIP—INTEREST IN PROFITS OF REAL ESTATE DEAL.—Where parties entered into a joint enterprise for the purpose of acquiring and reselling real estate for their mutual benefit, each to share equally in the profits, they became partners in the particular deal.

2. PARTNERSHIP—PROFITS FROM EXCHANGE OF REAL ESTATE.—In an action by a partner for an interest in the profits realized in an exchange of lands, evidence *held* to show that defendant partner secured title to land in the name of a codefendant without plaintiff's knowledge, through connivance with such codefendant and with fraudulent intent to deprive plaintiff of an interest in the profits.

3. TRUSTS—RESULTING TRUST.—Where title to property is taken in the name of one for the benefit of partners, a resulting trust not within the statute of frauds (Crawford & Moses' Dig., §§ 4862, 4866) was created against him in favor of such partners.

4. TRUSTS—CONSTRUCTIVE TRUST.—Where a partner took title to real estate received in exchange for partnership realty in the name of a third party, without his copartner's knowledge, with fraudulent intent to deprive the latter of any interest in profits, the transaction constitutes a constructive trust, to which the statute of frauds (Crawford & Moses' Dig., §§ 4862, 4866) does not apply.

5. PARTNERSHIP—ORAL CONTRACT FOR DEALING IN LANDS.—Under an oral contract to acquire and resell real estate for mutual benefit of a partnership, a partner may recover his interest in the partnership real estate, title to which had been fraudulently

taken in the name of another for the purpose of defeating his interest therein.

Appeal from Garland Chancery Court; *W. R. Duffie,* Chancellor; affirmed.

*George P. Whittington, Robinson, House & Moses, Frank Pittard* and *Harry E. Meek,* for appellant.

*E. P. Toney, James E. Huff* and *Martin, Wootton & Martin,* for appellee.

McHANEY, J. There is a very large record in this case, more than 1,100 pages, in two volumes. It will therefore be impossible to do more than state in a general way the substance of this controversy and the conclusions of law to be drawn therefrom, and at the same time confine this opinion within reasonable limits.

Appellants, Abraham Edlin and his son, J. Kenneth Edlin, are residents of Chicago, and engaged in the real estate brokerage business, while appellee is a resident of Indianapolis, Indiana, and engaged in the real estate brokerage business there, and has been for the past fourteen years. It appears from the evidence that he is a man in good standing with financial institutions in his own city, but of comparatively small means. In May, 1925, appellee and appellant, Kenneth Edlin, associated themselves together for the purpose of engaging in the real estate business for their joint benefit, each to share the profits and losses therefrom equally. After thus associating themselves, they engaged jointly in certain real estate transactions, the first being the purchase by them of an undivided one-half interest in a farm in Fayette County, Indiana, in which appellee already owned the other undivided one-half interest. In acquiring the outstanding undivided one-half interest appellee paid $2,500 cash, and Kenneth Edlin executed and delivered his note for the other $2,500, indorsed by appellee, which note has never been paid. After thus acquiring the equity in said farm, they traded it for a Chicago apartment building, known as the James Court, assuming a $200,000 mortgage thereon, and took the title thereto in the name of one

Frank J. Smidl, a straw-man, who was the chauffeur of appellant, Abraham Edlin. They thereafter made diligent efforts to sell or exchange the James Court property, and in other real estate efforts traveled extensively through Indiana, Illinois, Louisiana, Mississippi and Arkansas. They finally traded the James Court property for a plantation in Louisiana of 5,500 acres, together with all the personal property, live stock and crops on said plantation, subject to a mortgage of $35,000, and, as a part of the consideration, were given a third mortgage on the James Court property in the sum of $12,500. In their attempts to dispose of the James Court property they negotiated with Harry Daley, of Hot Springs, son of James E. Daley, the owner of a long-term lease on the Broadway Hotel in Hot Springs, for the exchange of this property for the lease on the hotel, both going to Hot Springs and negotiating personally with Harry Daley there. Daley interested his father in this matter, and they went to Chicago, at the invitation of Kenneth Edlin and Moser, to investigate the James Court property. In the meantime they had exchanged same for the Louisiana plantation, and they undertook to interest Mr. Daley in other property in Chicago, and he finally agreed to exchange his hotel property, free from any liens or incumbrances thereon, for a certain property in Chicago, known in the record as the Croninger property, subject to an incumbrance of $200,000.

On the 15th day of August, 1925, they entered into a written contract with James E. Daley for this exchange of property, the contract being signed by James E. Daley and the same Frank J. Smidl, the straw-man for Moser and Kenneth Edlin. At the time this contract was entered into they had not acquired the Croninger property, so as to be able to effect an exchange, but, on August 18, three days after the execution of the contract by Daley and Smidl, they procured the execution of a contract by the owner of the Croninger property, by which he agreed to convey same to the said Smidl for $25,000 in cash, sub-

ject to outstanding incumbrances in the sum of $200,000, the cash consideration to be paid within ten days, or not later than August 28, and the whole deal to be consummated as of September 15, through the Chicago Title & Trust Company. In both of these contracts it is undisputed that Moser. and Edlin were the real parties in interest, and that Smidl held the naked legal title for their use and benefit. Appellant, Abraham Edlin, was thoroughly familiar with the two contracts above mentioned. Immediately after securing the contract on the Croninger property, Kenneth Edlin and Moser left for Hot Springs, stopping at the Broadway Hotel, for the purpose of securing a loan of $25,000 on the hotel property to enable them to pay the $25,000 cash called for in the contract for the Croninger property. On their arrival in Hot Springs, Kenneth Edlin attempted to negotiate this loan. He applied to the Security Bank in Hot Springs for a loan of $30,000 to be secured by a first mortgage on the Broadway Hotel property, but did not get any loan or the promise of one. He then applied to the Arkansas Trust Company for a loan of $30,000 with such security.

Up to this point there is no disagreement in the evidence, of a substantial nature, but here the parties differ as to what occurred, appellee stating that Kenneth reported to him that the Arkansas Trust Company would make a loan of $30,000, and that all that was necessary was to get the papers in shape, show a clear title to the Broadway property, execute the note and mortgage therefor, and thus consummate the deal for the exchange of such properties; while Kenneth Edlin testifies that he reported to Moser that the Arkansas Trust Company would make the loan provided their financial and moral responsibility was shown to be good, upon an investigation to be made by Mr. Henderson, the president of the trust company, and that they both then agreed that they would have no chance of securing the loan; that they then left Hot Springs without undertaking to secure the loan

from any other bank there, although there were three or four others, and returned to Chicago. While in Hot Springs on this mission, and shortly before their departure for Chicago, Moser sent the following telegram to his wife in Indianapolis: "Deal financed. Fine. Leave here for Chicago tomorrow. Home Saturday some time. Mail Florida abstracts in my desk to me, Great Northern Hotel, Chicago, immediately. This matter same as completed."

They arrived in Chicago August 22, where a settlement was had with appellant, A. Edlin, relative to the James Court property, in which Moser was paid $3,352 as his share of the profits. Moser then returned to his home in Indianapolis, and shortly thereafter went to Louisiana and Mississippi in furtherance of their joint enterprises, leaving Kenneth Edlin in Chicago to close up the Broadway Hotel deal, and on the 2d or 3d of September was joined by Kenneth Edlin in the prosecution of their real estate work. Moser says the settlement relative to the James Court property was friendly, whereas appellants testify that appellee was very much dissatisfied with it, and became very angry, but finally accepted it. They both testify that A. Edlin asked them how the Hot Springs deal was getting along, and that they both told him it could not go through, as they had been unable to secure the loan of $30,000, and that A. Edlin, at that time, stated that he might take it over. A. Edlin says that they both told him that they were through with the deal, and that he went into it with the understanding that they were both out of it; that they gave it up because they were unable to finance the $25,-000 cash payment for the Croninger property. Either on the 22d or 23d of August, after Moser had gone, Kenneth Edlin communicated with Mr. Daley, who was then in Chicago, and informed him that the deal was going through, and asked him to take immediate steps for its consummation. He told Daley that he and Moser were partners in this and other matters. Upon receiving this

advice, Daley telegraphed two parties in Houston, Texas, who were interested with him in the Broadway Hotel, to meet him at Hot Springs at once, and that he left immediately for Hot Springs, arriving there on the 24th, and that Kenneth Edlin arrived on the same train with him. He prepared a deed to be executed by the corporation holding the record title to the Broadway Hotel to James E. Daley, and another deed conveying the same property from Daley and wife to appellant, Abraham Edlin. Mr. Daley thought he was dealing with Kenneth Edlin and Moser all the time, that they were partners in this transaction, and that he executed the deed to A. Edlin at Kenneth Edlin's suggestion. The deed from Daley and wife to A. Edlin had to be mailed to Mrs. Daley at Houston, Texas, for her signature and acknowledgment. It was acknowledged by her on the 27th day of August. On the 24th Kenneth Edlin received assurance from the trust company that they would make the loan for $30,000 on the hotel. He also had the title to the Broadway Hotel property examined. Both of the above mentioned deeds were dated August 25. He returned to Chicago, and was there on the 28th, when the $25,000 was due to be paid for the Croninger property. On August 27, Mr. Henderson, president of the Arkansas Trust Company, wrote the Drexel State Bank of Chicago, the following letter, and received the following reply thereto:

"Mr. J. Kenneth Edlin, of the brokerage firm of Abraham Edlin & Company of your city, is now in Hot Springs and is negotiating the purchase of a hotel here. In connection with the purchase he has made application to us for a loan of $30,000, which we are willing to advance. However, before doing so, we desire to obtain some definite information as to the financial responsibility of the firm and of Mr. Edlin, their business methods, etc. The title to the property will be taken in the name of Abraham Edlin, and he will execute the mortgage and note to us.

"We will very much appreciate it if you will give us whatever information you may have as to the Messrs.

Edlin. Any information you may furnish us will be held in strict confidence, and we will be glad to reciprocate the favor at any time we can serve you."

"August 31, 1925.

"Arkansas Trust Co.,

"Hot Springs National Park, Ark.

"Gentlemen: Attention Mr. Henderson.

"We are in receipt of your favor of the 27th inst., inquiring regarding Mr. J. Kenneth Edlin of the brokerage firm of Abraham Edlin & Co.

"In reply beg to say that we do not have an account under the name of J. Kenneth Edlin, but J. V. Edlin has carried a small checking account with us. Mr. Abraham Edlin has banked with us since February, 1924, is carrying a good four-figure balance at the present time. Dealings satisfactory.

"Yours very truly,

"_____, Cashier."

On the 28th day of August, after Kenneth had returned from Hot Springs, knowing that the loan would be made, Croninger came to the office of A. Edlin for his $25,000 cash payment. By agreement with A. Edlin, and on the payment by him of $1,000, the time was extended to pay the balance until a later day. Within the time the loan from the Arkansas Trust Company was consummated by Kenneth Edlin, in the name of A. Edlin, who signed the note and mortgage, and all the papers were forwarded to the Chicago Title & Trust Company for the purpose of having it deliver all deeds, the money on the loan, and settle the transaction between all parties concerned, which was accomplished on September 15, 1925.

On the back of Exhibit D to the deposition of A. Edlin, which is an application prepared by the Chicago Title & Trust Company, Frank J. Smidl on that day executed an order, indorsed thereon as follows: "Pay amount payable to me to order of J. Kenneth Edlin."

Appellee testified that he had no knowledge of any change in their plan to have the title to the Broadway

Hotel taken in their joint names, or in the name of Smidl for their joint benefit, until the 9th day of September, when he was in the office of A. Edlin's attorney, adjoining that of A. Edlin, where he saw a deed lying on the desk, conveying the Broadway Hotel to A. Edlin, and that he at that time objected, and insisted on his rights being protected in and to said property; that they had quite an angry discussion between them regarding the matter, and that at this meeting he was, for the first time, advised that it was the intention of appellants to exclude him from any interest in the deal. He thereafter instituted this action in the Garland Chancery Court to recover his interest in the profits of this deal.

On March 2, 1927, the court entered an interlocutory decree in favor of appellee to an undivided one-half interest in and to the Broadway Hotel property, subject to the mortgage aforesaid, and divesting a one-half interest out of appellants, and investing same in appellee, and directing the execution of a conveyance thereof to appellee, in which decree the court retained jurisdiction to state an account between the parties for the rents and profits accruing subsequent to October 1, 1925. This decree was later made final, and, in addition, appellee was given judgment for $5,024.64 against appellants, for which a lien was fixed upon the property for the payment thereof. From these decrees this appeal is prosecuted.

The diligence of learned counsel on both sides, in the preparation of briefs and citation of authorities for our assistance in deciding this case, is commendable. These briefs raise many questions we do not find it necessary to discuss or decide. We think the principal question is one of fact, that is, whether the relations existing between Kenneth Edlin and appellee constituted a partnership, and whether, under the facts in this case, the primary object of the suit was to recover an interest in land, and, the agreement therefor not being in writing, would be barred by the statute of frauds, §§ 4862 and 4866 of C. & M. Digest, or whether a suit for the recovery

of an interest in partnership profits, which would not be barred by the statute of frauds. We think a decided preponderance of the evidence shows that the parties entered upon a joint enterprise as partners, for the purpose of acquiring and reselling real estate for their mutual benefit, each to share equally in the profits, and that they are therefore partners in this particular deal; that they acquired the Croninger property in the name of Smidl with the view of trading it for the Broadway Hotel, which contract was also taken in the name of Smidl, and that Smidl held same as a trustee for the benefit of J. Kenneth Edlin and Moser; that Kenneth Edlin secured the loan of $30,000 from the Arkansas Trust Company in the name of A. Edlin without appellee's knowledge or consent, and, furthermore, took the title to the Broadway Hotel in the name of A. Edlin without the knowledge, consent, or even acquiescence of appellee, but through connivance with his father, and with a fraudulent intent to deprive appellee of any interest in the profits of the transaction. The proof showed the Broadway Hotel to be worth, on a conservative estimate, $100,000, which represented a net profit to them, after deducting the mortgage, of $70,000. This represented the profit to the partnership in the whole transaction, by which they exchanged the Croninger for the Broadway property. It did not cost A. Edlin one penny. True, he advanced on the Croninger property $1,000 on August 28, but he got it all back on September 15, plus about $2,500 in cash on account of the excess loan from the Arkansas Trust Company over the cash payment on the Croninger property, and expenses. It is true that A. Edlin incurred some expenses, approximately $2,500, in getting the transaction closed, all of which was returned to him out of the loan. Upon delivery of the instruments aforesaid to Smidl, a resulting trust was created as against Smidl, in favor of Kenneth Edlin and Moser, and, if the deal had been finally consummated through Smidl, but for their use and benefit as contemplated, it is not even

contended by appellants that the statute of frauds would be applicable, because a suit to enforce a resulting or constructive trust is specifically exempted from the statute of frauds.

We do not think that Moser abandoned his interest in the transaction, as contended by counsel for appellants, but, on the contrary, we are of the opinion that a preponderance of the evidence shows that he did not abandon, and that the taking of the title to the property in the name of A. Edlin, under the circumstances in this case, constitutes a constructive trust, or trust *ex maleficio,* and that the statute of frauds has no application under such a situation. In *Bray* v. *Timms,* 162 Ark. 247-271, 258 S. W. 338, 345, it was held that parol evidence is admissible and competent under § 4868, C. & M. Digest, to establish a resulting or constructive trust, and said: "But the statute also wisely provides that, where any conveyance shall be made of any lands or tenements by which a trust or confidence may arise or result by implication of law, such trust or confidence shall not be affected by the above rule. See § 4868, C. & M. Digest. Were the rule otherwise, a statute which was intended to prevent fraud would, in many cases, be a potent instrument of fraud."

The court in that case quoted from 1 Pomeroy's Eq. Jur., § 155, as follows:

"The second great division of trusts, and the one which in this country especially affords the widest field for the jurisdiction of equity in granting its special remedies, so superior to mere recoveries of damages, embraces those which arise by operation of law from deeds, wills, contracts, acts or conduct of parties, without any express intention, and often without any intention, but always without any words of declaration or creation. They are of two species, 'resulting' and 'constructive,' which latter are sometimes called trusts *ex maleficio;* and both these species are properly described by the generic term 'implied trusts.' Resulting trusts

arise where the legal estate is disposed of or acquired, not fraudulently or in the violation of any fiduciary duty, but the intent, in theory of equity, appears or is inferred or assumed from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title. In such case a trust results in favor of the person for whom the equitable interest is thus assumed to have been intended, and whom equity deems to be the real owner. * * * If one party obtains the legal title to property not only by fraud, or by violation of confidence or of the fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner.''

In that case the authorities are collected and reviewed at length, and it was there said, again quoting from Mr. Pomeroy, that the law is well established that trusts ex maleficio will be declared ''whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentation, concealment, or other undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means, or under any other similar circumstances, which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interests.'' 3 Pomeroy's Eq. Jur., § 1053. We therefore conclude on this point that A. Edlin holds the legal title to the Broadway Hotel property for the benefit of Moser and himself, or Moser and Kenneth Edlin.

Appellants rely upon the cases of Beebe v. Olentine, 97 Ark. 390, 134 S. W. 936, and O'Bryan v. Zuber, 168 Ark. 613, 271 S. W. 347, as authority preventing appellee from recovering an interest in the Broadway Hotel, for the reason that it is a suit to recover an interest in land or real estate on an oral agreement, which is prohibited

by the statute of frauds. We do not think these cases are authorities in point here. In the Olentine case, a partnership agreement for the purchase and resale of lands was involved, but the lands had been sold at a profit, and the court was dealing with money, and not with land. In *O'Bryan* v. *Zuber,* a partnership existed for the purpose of operating an orchard and dividing the profits. Zuber contended that he was entitled to a one-half interest in the land, which was to be paid for out of the profits of operating the orchard. He contributed nothing to the purchase of the land, and relied upon a parol agreement with O'Bryan, in which O'Bryan was to advance the purchase price, and was to be repaid out of the profits of operation. Here the facts are different. Here, from the result of their joint efforts, there is a profit from partnership activities, both in money and land, or a lease on land. They both contributed jointly to the acquisition of such property. By their joint efforts the Croninger property was acquired and traded for the Broadway property, which resulted in a profit to them of the Broadway property, subject to the mortgage. There was a surplus fund realized from the mortgage, over and above the cash purchase price for the Croninger property, and we think this suit primarily is to compel a division of profits realized from a partnership activity. We are furthermore of the opinion that they acquired the Broadway property for the purpose of reselling it, and we know of no rule of law that would prevent a partner from recovering his interest in partnership real estate, the title to which had been fraudulently taken in the name of another for the purpose of defeating his interest therein. *Toll* v. *Lewis,* 136 Ark. 318, 206 S. W. 442.

Finding no reversible error, the decree of the chancery court is affirmed.