Central States Life Insurance Company *v.* Barrow.

4-3651

Opinion delivered January 14, 1935.

*A. D. DuLaney* and *Rowell, Rowell & Dickey,* for appellant.

*M. L. Reinberger, Bridges, McGaughy & Bridges* and *Coleman & Gantt,* for appellees.

Smith, J. This suit is based upon the following written agreement:

"Limited partnership agreement..

"This agreement entered into the 10th day of February, 1930, by and between W. A. Barrow, Jim McLellan, J. C. Reeves, R. A. Smith, J. L. Longino and M. V. Mead, all of the city of Pine Bluff, county of Jefferson, State of Arkansas.

"First: The name of this partnership shall be Title Investors.

"Second: The purpose of this partnership is to borrow money to acquire 187 shares of the common capital stock of the Merchants' & Planters' Title & Investment Company, of Pine Bluff, Arkansas. Said amount of stock to be divided as follows:

"W. A. Barrow..................................................................25 shares

"Jim McLellan ...............................................................52 shares

"J. C. Reeves..................................................................25 shares

"R. A. Smith..................................................................25 shares

"J. L. Longino..............................................................30 shares

"M. V. Mead..................................................................30 shares

"This stock is being acquired at a basis of $100 per share, and it is contemplated a loan will be secured in the sum sufficient to carry the entire 187 shares. The maximum amount of indebtedness shall be $18,700, and the liability of each partner shall not be in excess of $100 for each share allotted each partner.

"Dividends received by virtue of the ownership of this stock shall be applied to the reduction of the principal-indebtedness, which will be a *pro rata* reduction of the liability of each partner. Levies may be made from time to time for a certain per cent. upon each of the partners to be applied to the reduction of principal or to pay interest, as the case may be. In the event a partner desires to pay off in full (which is at the rate of $100 per share), the amount outstanding against his particular number of shares, he may do so and withdraw from this limited partnership and be relieved of any further liability in same.

"It is mutually agreed by all partners that M. V. Mead shall be appointed manager for this partnership, and said such manager shall have the power and authority to execute notes and assign this stock for the purpose of securing a loan on same, but at no time shall he have the authority to borrow a sum in excess of $18,700. When the indebtedness occasioned by the purchasing and carrying of this group of stock has been repaid in full, the stock shall be transferred to the respective members of this partnership, and same shall at that time be automatically dissolved.

"Witness our hands and seals this the day and year above written.

"W. A. Barrow,

"Jim McLellan,

"J. C. Reeves,

"R. A. Smith,
"J. L. Longino,
"M. V. Mead."

Pursuant to its terms and the authority there conferred, Mead, as manager of "Title Investors," applied to and obtained from the Merchants' & Planters' Bank & Trust Company, of Pine Bluff, a loan of the money to purchase 187 shares of the common capital stock of the Merchants' & Planters' Title & Investment Company. The persons whose names are signed to the agreement each advanced 10 per cent. of the cost of the stock to be bought for them respectively, so that it was necessary to borrow only 90 per cent. of the $18,700 which the stock cost. The sum of $16,830 was borrowed, and a note for that amount was executed in the name of "Title Investors," signed by M. V. Mead as manager. This note was made payable in six months, and bore interest at the rate of six per cent. per annum from date until paid.

At the trial from which this appeal comes, the court found the fact to be that "The undisputed proof also shows this agreement (set out above) itself was attached to the note which was given to the Merchants' & Planters' Bank." The testimony sustains that finding of fact. The purchased stock was also attached to the note as collateral, so that the bank had $18,700 worth of stock as collateral for a loan ten per cent. less than that amount, or $16,830.

As appears from the agreement, J. L. Longino was to be the purchaser of 30 shares of stock, which, at $100 per share, would make $3,000, but as he and all the other signers had paid 10 per cent. of the purchase price, he owed only $2,700 on the stock to be issued him individually. In April, 1930, and before the maturity of the original note for $16,830, Longino paid the balance due on his stock, and that payment was credited on the note, leaving a balance due of $14,130. No other payment of principal was made, and the note at its maturity was renewed for six months' additional time. This renewal note was dated August 20, 1930, and was for $14,130, and was signed "Title Investors, by M. V. Mead, Manager."

The agreement, set out above, was attached to the

renewal note, and so also were the remaining "157 shares common capital stock Merchants' & Planters' Title & Investment Company for a par value of $100." There were 30 shares less collateral for the renewal note than for the original note, this resulting from the payment by Longino of the price of his 30 shares of stock and his withdrawal of that amount from the pool or agreement, as it authorized him to do.

Before the maturity of the renewal note, a run started on the Merchants' & Planters' Bank & Trust Company, which the Home Life Insurance Company sought to stop by the purchase of $200,000 worth of the notes held and owned by the bank. $200,000 cash was paid for these notes, and a few days later an additional purchase of $150,000 worth of notes and securities was made by the insurance company from the bank. A list of the notes so first purchased amounting to $200,000 was made by the bank and delivered to the representative of the insurance company in the fall of 1930, but the notes themselves were not actually delivered. They were left in the possession of the bank for collection for the account of the insurance company. The note here sued on was included in this list, and it, along with all the others, was left in the bank's possession for the purpose stated.

The Home Life Insurance Company itself became involved in financial difficulties and was compelled to cease operations. In doing this it made a reinsurance agreement effective March 31, 1931, with the Central States Life Insurance Company, of St. Louis, which was approved by the State Insurance Department on April 6, 1931. By the terms of this agreement the Central States Life Insurance Company took over and became the owner of all the assets of the Home Life Insurance Company, the note here involved being a part thereof.

A controversy arose between the bank and the Home Life Insurance Company over the notes described in the $200,000 list of notes. The bank contended that it had the right to substitute other notes for the notes there described. The story of this controversy and the result thereof is told in the opinion of this court in the case of *Home Life Insurance Co.* v. *Taylor,* 186 Ark. 768, 52 S.

W. (2d) 929. It was there held that the right of substitution did not exist, and that the insurance company was entitled to the identical notes described in this list, and, as has been said, the note here in suit is one of them. This note had matured when the Central States Life Insurance Company became the owner thereof and entitled to its possession. The actual delivery of the note to the representative of the Central States Life Insurance Company was made April 13, 1931. On the reverse side of the note appeared the indorsement: "Without recourse. Merchants' & Planters' Bank & Trust Company, by J. P. Jordan, Vice President." This indorsement was made when it was entered as one of the notes described in the $200,000 list of notes. Another indorsement was: "Without recourse. Marion Wasson, State Bank Commissioner, in charge of Merchants' & Planters' Bank & Trust Company, Pine Bluff, Arkansas, by J. E. Williams, Deputy Bank Commissioner." This last indorsement was made when the bank commissioner delivered the note to the representative of the Central States Life Insurance Company, which, as has been said, was after its maturity.

The Central States Life Insurance Company, being now the owner of the note, has sued to enforce its collection. The suit was brought upon the theory that the Title Investors was a general partnership, resulting from an abortive attempt to organize and form a limited partnership, and it is insisted that the parties are jointly and severally liable for the full amount of the note, and judgment was prayed against each of them as such.

It is not contended that the statute (§§ 8127 *et seq.*, Crawford & Moses' Digest), relating to the formation of a limited partnership, was complied with, and limitation of the liability imposed upon such partners is not claimed. The insistence is that no partnership of any kind was formed, and whether this is true is the controlling question in the case. This is true, because any inquiry as to who and what "Title Investors" was would have been answered by an examination of the agreement, herein set out, which was attached to the note itself. This agreement also disclosed the nature and extent of Mead's authority to borrow money and the manner in which it was

to be repaid. The bank was charged with this knowledge when it elected to make the loan, and it was no contradiction of the note to prove the condition and purpose of the loan and the manner proposed for its payment, because the agreement, by being attached to the note, became a part of it. 1 Joyce's Defenses to Commercial Paper, § 484; Daniel on Negotiable Instruments, vol. 1 (6th ed), § 156. There is no question therefore as to the rights of innocent holders of the note.

The agreement herein set out was prepared by Mead, who is not an attorney, and there is no contention that there was any attempt to form a limited partnership, and we concur in the view of the trial court that no partnership of any kind was formed.

It is true the writing refers to the contract as a partnership and to the subscribers as partners, and to Mead as manager of the partnership; but the legal effect of the instrument is to be determined by a consideration of the instrument in its entirety. The designation of the relationship as a partnership is a fact to be taken into account, but it is not decisive of the relationship; but, except for this designation, there is nothing in the writing to indicate that the relation of partners was created.

As to whether a partnership exists or does not exist is dependent, not upon the name given to the relationship, but upon the terms of the relationship itself. This question was considered and the authorities reviewed in the case of *H. H. Worden Co.* v. *Beals,* 120 Ore. 66, 250 Pac. 375. In this opinion by the Supreme Court of Oregon, after quoting from Page on Contracts, vol. 3, § 1688, it was said: "He" (Page) "also says that, in construing partnership contracts, the question whether they have formed a partnership is to be determined by what they have agreed to do, and not by what they have agreed to call themselves." The authorities to the same effect are too numerous to collect. Among our own cases in harmony with this general rule are the following: *Oliver* v. *Gray,* 4 Ark. 425; *Roach* v. *Rector,* 93 Ark. 521, 123 S. W. 399; *Mehaffy* v. *Wilson,* 138 Ark. 281, 211 S. W. 148; *Stone* v. *Riggs,* 163 Ark. 211, 259 S. W. 412; *Nichlas* v. *Olvey,* 182 Ark. 31, 30 S. W. (2d) 827.

We have many cases in our own reports announcing the tests to be applied in determining whether the partnership relation has been created and exists. One of these is the case of *Roach* v. *Rector, supra,* in which it was held (to quote a headnote) : "As between the parties to an alleged partnership, the true test of a partnership is whether the parties actually joined together to carry on a trade or adventure for their common benefit, each contributing property or services and having a community of ownership in the property and of interest in the profits of the business." See also *Howell* v. *Harvey,* 5 Ark. 270; *Allen* v. *Davis,* 13 Ark. 28; *LaCotts* v. *Pike,* 91 Ark. 26, 120 S. W. 144; *Beebe* v. *Olentine,* 97 Ark. 390, 134 S. W. 936; *Harrison* v. *Walker,* 124 Ark. 555, 188 S. W. 17; *Stephens* v. *Neely,* 161 Ark. 114, 255 S. W. 562; *A. B. Jones Co.* v. *Davis,* 181 Ark. 265, 25 S. W. (2d) 434.

It was said by the Supreme Court of the United States in the case of *Meehan* v. *Valentine,* 145 U. S. 611, 12 S. Ct. 972, that: "The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services and having a community of interest in the profits." This declaration of the law has been cited and approved by this court in several cases.

Under the tests which these and other cases have applied, we conclude there was no partnership. It was not contemplated that the parties should carry on a business of any kind. A single transaction was involved, to-wit, the purchase of stock and the borrowing of money to pay for it. But all the stock was not bought for all the parties. Each person bought a specific number of shares, which was to be his own individual property when he had paid for it, and he might make the payment when he pleased, and when he had done so his interest in the agreement ceased. No division of property or profits was contemplated, and there was no provision for sharing losses.

The agreement contemplated the possibility that none of the signers might pay for their stock, in which event it was provided that all the stock might be sold to

realize money to repay the loan with which it was bought. It was also provided that: "In the event a partner desires to pay off in full (which is at the rate of $100 per share) the amount outstanding against his particular number of shares, he may do so and withdraw from this limited partnership and be relieved of any further liability in same," and it was provided further that: "The liability of each partner shall not be in excess of $100 for each share allotted each partner."

That the contract was understood and interpreted by the parties thereto and by the bank also as thus limiting the liability of each signer, is shown by the action of these parties and the bank thereunder. Longino paid for his stock, as he was given the right to do, and the collateral was reduced from 187 shares to 157 shares, a difference of 30 shares, the number Longino had contracted to buy, and the renewal note was executed for the amount of the original note, less the exact sum of money paid by Longino to the bank.

A verdict in Longino's favor was properly directed, but judgment was rendered against each of the other signers for $100 for each share of stock they had contracted to buy, with interest thereon at the rate of six per cent. from the date of judgment. This judgment, in our opinion, was correct, except as to the interest. The note bore interest at the rate of six per cent. per annum from date until paid, and the judgment should therefore have been rendered for the interest from the date of the note. The judgment will be modified, and, as thus modified, will be affirmed. It is so ordered.